## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                                      )
MEDHIN AYELE, *et al.*,                               )
                                                      )
                        Plaintiffs,                   )
                                                      )
            v.                                        )          Civil Action No. 23-1785 (ABJ)
                                                      )
DISTRICT OF COLUMBIA, *et al.*,                       )
                                                      )
                        Defendants.                   )
_____)

## <u>MEMORANDUM OPINION AND ORDER</u>

On June 20, 2023, plaintiffs filed a complaint seeking a declaratory judgment and injunctive relief barring enforcement of D.C. Code § 47-2862, the "Clean Hands Law," with respect to "occupational and small business licenses." Compl. [Dkt. # 1] at ¶¶ 4, 31–32. On the day they filed their complaint, plaintiffs also filed a Motion for a Preliminary Injunction. *See* [Dkt. # 3] ("Mot."). The Court convened a scheduling hearing on June 26, 2023, *see* Min. Entry (June 26, 2023), and established a briefing schedule. Defendants opposed the motion, *see* Defs.' Opp. to Mot. [Dkt. # 17] ("Opp."), and plaintiffs filed a reply. *See* Pls.' Reply to Opp. [Dkt. # 10] ("Reply").[1] The Court held a hearing on August 14, 2023, *see* Min. Entry (Aug. 14, 2023).

Five of the seven plaintiffs are street vendors. Compl. at ¶¶ 18–22. Given the passage of the Street Vendor Advancement Amendment Act of 2023, which was scheduled to take effect on October 1, 2023, the Court requested supplemental briefing from the government on the status of the legislation and whether the amnesty program it created had been funded. *See* Min. Order (Oct.

---

[1]    Defendants' filing included a combined opposition to plaintiffs' motion and a motion to dismiss the complaint, [Dkt. # 17], but the Court's ruling at this time is only with respect to plaintiffs' emergency motion.

3, 2023).  The government filed a response indicating that the amnesty program has been funded as of October 1, 2023, making "corrective relief available to the street vendor [p]laintiffs."  Defs.' Response to the Court's Oct. 3, 2023 Minute Order [Dkt. # 29] ("Defs.' Oct. 3 Response").

Upon consideration of that information and the entire record of the case, the motion for a preliminary injunction will be **DENIED**.  Plaintiffs have failed to make the showing of irreparable harm that is essential to support a grant of extraordinary relief.

## BACKGROUND

The District of Columbia "Clean Hands Law" states that "the District government shall not issue or reissue a license or permit to any applicant for a license or permit if the applicant … [o]wes the District more than $100 in past due taxes" or "[o]wes the District more than $100 in outstanding fines, penalties, or interest."  D.C. Code §§ 47-2862(a)(2), (7).  There are two exceptions to this rule: (1) if the applicant has disputed the amount of outstanding debt over $100 and has a properly and timely filed appeal pending, *see* § 47-2862(b); or (2) if the applicant "has agreed to a payment schedule [with the District] to eliminate the outstanding debt."  § 47-2862(c).  Any individual whose application is denied "may request a hearing within 10 days of the denial on the basis for that denial."  § 47-2865(c).

According to the complaint, the impact of the Clean Hands Law is "severe and often life-altering."  Compl. ¶ 6.  Plaintiffs allege that the law bars those unable to pay their outstanding taxes or fines from obtaining occupational licenses, entering their chosen fields, and "fulfilling their dream of opening a small business," thus "trapping individuals in poverty and preventing them from securing licenses that will only help them pay back their debts."  Compl. ¶ 6.  The seven plaintiffs in this case owe three types of debt – unpaid taxes, parking and traffic fines, and a fine

for vending without a license – preventing them from obtaining occupational and small business licenses from the D.C. government.  Compl. ¶¶ 8–10.

Plaintiff Shawn Cheatham is a military veteran currently living in D.C.  Compl. ¶ 16.  He hopes to open a small plumbing and handyman business.  Compl. ¶ 16.  But because he owes over $3,000 in parking and traffic tickets and fines, the Clean Hands Law has allegedly "automatically disqualified Mr. Cheatham from obtaining the license required to achieve small business ownership."  Compl. ¶ 16; Mot. at 5–6.[2]

Plaintiff Stephanie Carrington is a D.C. resident who is a "fully-licensed speech pathologist in Maryland and Virginia."  Compl. ¶ 17.  She does practice her chosen profession, but she aspires to hang out a shingle in D.C. as well, which would require both a small business license and a speech pathology occupational license issued by the District.  Compl. ¶ 17; Mot. at 6.  Plaintiffs allege that the Clean Hands Law bars Carrington from practicing in D.C. because she owes over $5,000 in unpaid parking tickets, automatic camera tickets, red-light tickets, and accrued penalties and late fees.  Compl. ¶ 17; Mot. at 6–7.

---

2       Defendants state that Mr. Cheatham failed to mention that he will also need an occupational plumber's license, which has a separate set of requirements, to start a plumbing business, and that there is no evidence in the record of whether he would qualify.  Opp. at 8.

The remaining five plaintiffs – Medhin Ayele,[3] Kahssay Ghebrebrhan,[4] Fasika Mehabe,[5] Hiwet Tesfamichael,[6] and Antonia Diaz de Sanchez[7] – have all served as street vendors in the District "for decades and want to continue doing so."  Compl. ¶ 53.  They allege that the Clean Hands Law "has automatically blocked them from renewing their vending licenses" because they

---

3       Plaintiff Ayele first began working in D.C. as a street vendor in 1995, primarily selling hot dogs, candy, chips, and other food items.  Declaration of Medhin Ayele, Ex. C to Mot. [Dkt # 3–4] ("Ayele Decl.") ¶ 3.  She has renewed her vending license regularly since then from 1995 to 2020 without incident, but in 2020, she paused her business due to the COVID-19 pandemic.  *Id.* ¶ 5.  Because she was not actively vending, her vending license expired on September 30, 2020. *Id.* ¶ 6.  She attempted to renew her street vendor license in 2021 and 2022, but she alleges that the Clean Hands Law prevented her from doing so because of unpaid quarterly street vending fees assessed during the COVID-19 pandemic, "which were imposed even after Ms. Ayele's license had lapsed." *Id.* ¶ 7; Mot. at 8–9.  After seeking additional information from the D.C. government, she alleges that she was informed that some of the debt was assessed erroneously.  *Id.* ¶¶ 7–8; Mot. at 9.  While she was able to reverse some of her tax liability, some of it remains, and she maintains that she is unable to pay it off unless she can resume vending.  *Id.* ¶¶ 7–8, 12.

4       Plaintiff Ghebrebrhan has worked as a D.C. street vendor since 1991, primarily selling hot dogs, as well as candy, soda, and chips.  Declaration of Kahssay Ghebrebrhan, Ex. D to Mot. [ Dkt. # 3-5] ("Ghebrehrhan Decl.") ¶ 2.  He renewed his license from 1991 to 2020 every two years with no issues.  *Id.* ¶ 4.  He temporarily stopped street vending in March 2020 due to the COVID-19 pandemic.  *Id.* ¶ 6.  On September 30, 2020, his vending license lapsed.  *Id.* ¶ 7.  In 2021, he attempted to renew his vending license, but alleges that the Clean Hands Law prevented him from doing so because he owes approximately $1,000 worth of unpaid quarterly street vending fees from 2020.  *Id.* ¶ 11.  He alleges that the D.C. government later informed him that some of this debt was issued erroneously, and he was able to have his debt partially reduced.  *Id.* ¶ 10–11.  But he claims that the remaining debt still bars him from renewing his vending license, and he is currently unemployed.  *Id.* ¶ 12.

5       Plaintiff Mehabe first began working as a D.C. street vendor in 1996, selling hot dogs and other items.  Declaration of Fasika Mehabe, Ex. E to Mot. [Dkt # 3-6] ("Mehabe Decl.") ¶ 3.  She renewed her license from 1996 to 2020 every two years with no issues.  *Id.* ¶ 4.  She temporarily stopped street vending in March 2020 due to the COVID-19 pandemic.  *Id.* ¶ 7.  On September 30, 2020, her vending license lapsed.  *Id.* ¶ 8.  In 2022, Ms. Mehabe wanted to renew her vending license, but alleges that the Clean Hands Law prevented her from doing so because she owes approximately $4,856 in debt to the District.  *Id.* ¶ 9.  Ms. Mehabe has picked up various temporary jobs, including working as a dishwasher, but alleges that she remains both unable to pay her debt and barred from renewed her vending license.  *Id.* ¶ 10.

owe unpaid quarterly street vending fees.[8]   Compl. ¶ 10.  The complaint and supporting

declarations assert that the vendors are trapped in a "Catch-22" scenario in which they cannot vend

without paying off their debts, but they cannot pay off their debts without vending.

On June 20, 2023, plaintiffs brought this action seeking a declaratory judgment and

injunctive relief barring enforcement of the Clean Hands Law with respect to occupational and

small business licenses.  Compl. at ¶¶ 4, 13.  The complaint includes four claims brought under

the Fifth Amendment and 42 U.S.C. § 1983:

> Count I alleges a violation of the right to procedural due process on the
> grounds that plaintiffs have a "constitutionally protected property interest
> in retaining or receiving an occupational or small business license," and the

---

6       Plaintiff Tesfamichael has worked as a D.C. street vendor since 1991, and had renewed her
vending license every two years from 1991 to 2020 without any issues.  Declaration of Hiwet
Tesfamichael, Ex. F to Mot. [Dkt # 3-7] ("Tesfamichael Decl.") ¶¶ 3–4.  She temporarily stopped
street vending in April 2020 due to the COVID-19 pandemic.  *Id.* ¶ 7.  On September 30, 2021,
Ms. Tesfamichael's vending license lapsed.  *Id.* ¶ 8.  She alleges that she attempted to renew her
license in 2022 but was informed by District employees that she could not do so under the Clean
Hands Law because she owed quarterly vending fees from 2020.  *Id.* ¶ 10.  She has been working
part time in food preparation, but she avers that she earns much less in this position and therefore
cannot pay off her debt and obtain a vending license.  *Id.* ¶¶ 12–13.

7       Plaintiff Diaz de Sanchez has worked as a D.C. food truck vendor since 2016, selling meals
such as fried and grilled chicken, flautas, empanadas, and chips.  Declaration of Antonia Diaz de
Sanchez, Ex. G to Mot. [Dkt # 3-8] ("Diaz de Sanchez Decl.") ¶ 3.  She renewed her license
successfully and without issue until 2020, when she fell ill with COVID-19 and consequently
paused her business.  *Id.* ¶ 7.  She sold her food truck to be able to afford her rent and bought a
new truck later that same year.  *Id.* ¶ 8.  She claims that while she was test driving the new truck,
an inspector wrongfully issued her a $3,000 vending-related ticket while the car was parked, even
though there was no food in the truck and she was not selling anything.  *Id.* ¶ 8.  Because of this
unpaid debt, she alleges that she has not been able to renew or apply for a new vending license due
to the Clean Hands Law.  *Id.* ¶ 9.  Ms. Diaz de Sanchez tried to resolve her license issues several
times in 2021 and is currently unemployed.  *Id.*  ¶¶ 9–10.

8       Street vendors in D.C. must pay a quarterly street vending fee of $375 "in place of
collecting and remitting sales tax for the three (3) preceding months."  Mot. at 9 n.3, citing *Street
Vendors*, D.C. Office of Tax Revenue, https://otr.cfo.dc.gov/book/other-topics-faqs/street-vendors
(last visited Nov. 30, 2023).

Clean Hands Law does not provide individuals with procedural due process before refusing to issue or renew a license, Compl. ¶¶ 102–105;

Count II alleges a violation of the rights to due process and equal protection under the laws on the grounds that plaintiffs have a right "not to be punished by Defendants because of their poverty," and the Clean Hands Law deprives plaintiffs of their property interests "without inquiring into their ability to pay their outstanding debt;" Compl. ¶¶ 109–111;

Count III alleges a violation of substantive due process on the grounds that the Clean Hand Law's application to plaintiffs "is irrational and serves no legitimate government purpose," Compl. ¶¶ 115–117; and

Count IV alleges a violation of the equal protection clause founded on what plaintiffs describe as the Clean Hands Law's "classification system" of "allowing individuals that have an ability to repay their debt to obtain occupational and small business licenses, but precluding individuals without an ability to pay their debt from doing so." Compl. ¶¶ 119–125.

Plaintiffs also allege that the law violates the Eighth Amendment's prohibition on excessive fines. Compl. ¶ 132. In their Motion for a Preliminary Injunction, plaintiffs seek to enjoin defendants from enforcing the Clean Hands Law "with respect to occupational and small business licenses or, at a minimum," to prohibit the District "from continuing to unconstitutionally enforce the Clean Hands Law" against plaintiffs. Mot. at 2.

Prior to filing this lawsuit and during the time the action was pending, the street vendor plaintiffs and others were also pursuing a legislative solution to ameliorate the burdens imposed by strict enforcement of the Clean Hands Law. Reply at 42. In May 2023, the D.C. Council passed the "Street Vendor Advancement Amendment Act of 2023,"[9] an amnesty program for street vending license applicants with "[m]inimum sales tax payments owed pursuant to D.C. Official Code § 47-2002.01 from 2010 to the effective date of [the] act." Mot. at 18; Opp. at 5 n.2, citing

---

9       The Street Vendor Advancement Amendment Act of 2023 combined two bills: the Street Vending Decriminalization Act of 2021 and the Sidewalk Vending Zones Amendment Act of 2021. *See* Declaration of Geoff Gilbert [Dkt # 23-1] ¶ 4.

Street Vendor Advancement Amendment Act of 2023, § 3(f), D.C. Act 25-94, 70 D.C. Reg. 6,762, 6,776 (May 12, 2023).  The program, which went into effect on July 1, 2023, *see* D.C. Code § 37-131.08c, and has been funded as of October 1, 2023, *see* Defs.' Oct. 3 Response, operates to forgive vendors' unpaid minimum quarterly licensing fees and enable them to apply for and receive street vending licenses.  Mot. at 18; Opp. at 5 n.2.

## STANDARD OF REVIEW

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a *clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong,* 520 U.S. 968, 972, (1997) (emphasis in original); *see also Munaf v. Geren,* 553 U.S. 674, 690–91 (2008).

As the Supreme Court explained in *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008), when considering a motion for a preliminary injunction, the Court must consider whether the movant has met its burden of demonstrating that 1) it "is likely to succeed on the merits"; 2) it is "likely to suffer irreparable harm in the absence of preliminary relief"; 3) "the balance of equities tips in [its] favor"; and 4) an injunction "is in the public interest."  *Id.*

The manner in which courts should weigh the four factors "remains an open question" in this Circuit.  *Aamer v. Obama*, 742 F.3d 1023, 1043 (D.C. Cir. 2014).  Before *Winter*, the Court of Appeals adhered to the "sliding-scale" approach, where "a strong showing on one factor could make up for a weaker showing on another."  *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011), citing *Davenport v. Int'l Bhd. of Teamsters*, 166 F.3d 356, 360–61 (D.C. Cir. 1999).  However, the *Sherley* opinion explains that the Supreme Court's decision in *Winter* "seemed to treat the four factors as independent requirements."  *Id.* at 393.

Regardless of whether the sliding scale framework applies, it remains the law in this Circuit that a movant must demonstrate irreparable harm, which has "always" been "the basis of injunctive relief in the federal courts." *Sampson v. Murray*, 415 U.S. 61, 88 (1974), quoting *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 506–07 (1959); *see also Winter*, 555 U.S. at 22 (rejecting that a strong likelihood of success on the merits lessens the movant's burden to showing a "possibility" rather than a "likelihood" of irreparable harm). A failure to show irreparable harm is grounds for the Court to refuse to issue an injunction, "even if the other three factors entering the calculus merit such relief." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).

The D.C. Circuit "has set a high standard for irreparable injury" – it "'must be both certain and great; [and] it must be actual and not theoretical.'" *Id.* at 297, quoting *Wisc. Gas Co. v. FERC,* 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam). In *England,* the Circuit made it clear that "the injury must be beyond remediation."

> The key word in this consideration is *irreparable.* Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation[,] weighs heavily against a claim of irreparable harm.

*Id.*, quoting *Wisc. Gas Co.*, 758 F.2d at 674 (emphasis in original).

## ANALYSIS

The assessment of the likelihood of success on the merits raises a number of thorny issues, including whether the plaintiffs have standing to challenge the law at all, since none of them alleges that they actually applied for a license or permit and got turned down. But for purposes of the motion for preliminary injunction, the Court's analysis can begin and end with irreparable harm. Plaintiffs devote exactly one page of the 42-page memorandum in support of their motion for a

preliminary injunction to the question of irreparable harm, and they advance two theories: that the alleged loss of constitutional rights automatically makes interim relief available, and that the economic hardship they have endured and the inability to work in their chosen profession cannot be adequately remedied with money damages. Mot. at 39–40.  Since neither of these theories is supported by law, and because plaintiffs have failed to demonstrate that their alleged injuries are irreparable, or are of the "certain and great" nature that would warrant enjoining the application of a generally applicable law enacted by the legislature twenty-seven years ago, the motion for a preliminary injunction will be denied.[10]

## I.   The mere fact that the complaint alleges the violation of constitutional rights does not satisfy the need for a showing of irreparable harm.

Plaintiffs first predicate their entitlement to interim relief on the theory that "[t]he violation of constitutional rights is a well-established irreparable harm," Mot. at 3, and they point to statements in D.C. Circuit opinions that "[t]he loss of constitutional freedoms, 'for even minimal periods of time, unquestionably constitutes irreparable injury.'"  *Id.* at 39; *see, e.g.*, *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009), quoting *Elrod v. Burns*, 427 U.S. 347, 373

---

10    Plaintiffs initially insisted that this case was governed by *Parham v. District of Columbia*, 648 F. Supp. 3d 99 (D.D.C. 2022), which found that a group of D.C. residents were likely to succeed on the merits of their claim that the District's enforcement of the Clean Hands Law denied them procedural due process when applied to applicants for driver's licenses.  But *Parham* is of little value here; the opinion, which would not have been binding on this Court in any event, was vacated at the parties' joint request.  *See* Order, *Parham v. District of Columbia*, No. 22-cv-2481 [Dkt. # 27]. And, although the court did find that the plaintiffs would suffer irreparable harm if the law was not enjoined pending consideration of the merits, it is notable that the District did not contest that issue in that case.  *Parham*, 648 F. Supp. 3d at 115. More importantly, the facts in *Parham* were entirely distinguishable:  the lawsuit only concerned the operation of the law on an individual's ability to obtain or renew a driver's license, and the court concluded that in that circumstance, the law served as a barrier to an applicant's ability to earn any income at all.  *Id.* ("Plaintiffs have trouble finding and keeping work, buying groceries, accessing medical care, [and] caring for children and aging parents.").

(1976).  But the Court agrees with defendants that *Elrod* is more limited than plaintiffs make it out to be, and that the case did not establish a per se rule that all alleged First Amendment violations, much less, all constitutional violations, automatically give rise to irreparable harm.

*Elrod* addressed the fact that it had "been the practice of the Sheriff of Cook County, when he assumes office from a Sheriff of a different political party, to replace non-civil-service employees of the Sheriffs' Office with members of his own party when the existing employees lack or fail to obtain requisite support from, or fail to affiliate with, that party."  417 U.S. at 351. A group of Republican non-civil-service employees, who were discharged or facing discharge solely because they did not support the party of the incoming Democratic sheriff, sued and sought a preliminary injunction, alleging violations of the First and Fourteenth Amendments.  *Id*. at 350. The district court found that they failed to make an adequate showing of irreparable injury, but the Court of Appeals reversed and remanded, instructing the district court to enter preliminary injunctive relief.  *Id.*  The Supreme Court affirmed this decision in a plurality opinion, recognizing first that "the practice of patronage dismissals clearly infringes First Amendment interests."  *Id.* at 360.  This context informed the Court's brief analysis of whether a preliminary injunction was warranted, which hinged upon whether plaintiffs had established an irreparable injury:

> [M]any of the members of the class . . . were threatened with discharge or had agreed to provide support for the Democratic Party in order to avoid discharge.  It is clear therefore that First Amendment interests were either threatened or in fact being impaired at the time relief was sought.  The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.

*Id.* at 373.

Thereafter, the D.C. Circuit was called upon to apply *Elrod* in *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d at 299–304.  In *England*, current and former Navy chaplains alleged that the Navy unconstitutionally established and maintained a religious quota system in

the Navy Chaplain Corps to the detriment of non-liturgical chaplains, violating the First and Fifth Amendments. *Id.* at 295. Plaintiffs sought a preliminary injunction, arguing that the Navy's alleged violation of the Establishment Clause constituted irreparable injury per se under *Elrod*. *Id.* at 299. The Navy argued that *Elrod* did not apply because that case "involved political speech and expression, a context far removed from the Establishment Clause." *Id.* The Court of Appeals agreed with the Navy's interpretation, noting that the "facts of *Elrod* . . . the plurality's citation to . . . a landmark free expression case; and the footnote stressing the 'timeliness of political speech' make evident that the pertinent *Elrod* language on which [plaintiffs] rely is directed toward circumstances concerning freedom of expression." *Id.* at 300 (collecting cases). The court emphasized that "in almost all of the many" subsequent circuit court cases applying *Elrod*'s plurality statement, "the operative First Amendment liberties allegedly violated were variants of expressive liberties, such as the rights to speak, associate, petition, or exercise one's religion." *Id.* at 301 (further noting that, in contrast, the number of cases applying *Elrod* in the Establishment Clause context was meager, and "each of these decisions cites *Elrod* only in passing, devoid of any analysis of its particular context.").

After explaining that the Navy had "accurately note[d] that this court has construed *Elrod* to require movants to do more than merely allege a violation of freedom of expression in order to satisfy the irreparable injury prong of the preliminary injunction framework," *id.*, the court went on to hold that "while *Elrod* arose in the context of political speech, and its operative language has been employed almost exclusively with respect to restrictions on free speech, free exercise of religion, or other variants of freedom of expression, we think it is also applicable to purported Establishment Clause violations." *Id.* at 302. Notably, the opinion also announced that appellees were correct "when they assert that in this court, as in several others, 'there is no *per se* rule that a

11

violation of freedom of expression *automatically* constitutes irreparable harm.'" *Id.* at 301 (emphasis in original). And although it then adopted the rule that "a party alleging a violation of the Establishment Clause per se satisfies the irreparable injury requirement," *id.* at 304, the Court of Appeals came to this conclusion not by relying on *Elrod*, but by examining the specific context of Establishment Clause violations:

> We reach this conclusion not simply by axiomatically applying *Elrod*'s admonition that "[t]*he loss of First Amendment freedoms*, for even minimal periods of time, unquestionably constitutes irreparable injury," as other courts have done and [plaintiffs] urge. Rather, we emphasize the language surrounding this maxim and note its validity with respect to Establishment Clause claims.

*Id.* at 302 (emphasis added). In examining the context of the violation, the court highlighted "the inchoate, one-way nature of Establishment Clause violations," and the fact that the harm inflicted by religious establishment is "self-executing and requires no attendant conduct on the part of the individual." *Id.* at 303.

Other circuits have agreed that *Elrod* did not establish a per se rule with respect to constitutional violations and irreparable harm. In *Constructors Ass'n of W. Pa. v. Kreps*, 573 F.2d 811, 820 n.33 (3d Cir. 1978), the court observed, "[i]t should be noted that, unlike First Amendment rights whose deprivation even for minimal periods of time constitutes irreparable injury, *see Elrod v. Burns*, 427 U.S. 347, 372–73 (1976), a denial of equal protection rights may be more or less serious depending on the other injuries which accompany such deprivation." (holding violation of equal protection under Fifth and Fourteenth Amendments did not establish irreparable harm).

Thus, while plaintiffs are correct that, at least in this circuit, *Elrod* has been extended beyond the limited context of cases involving restraints on free expression, there is no per se rule that the violation of any constitutional right is inherently irreparable. And none of the categories

of per se violations that have been recognized in this circuit are analogous to the situation at hand: the operation of the Clean Hands Law does not inhibit or chill plaintiffs' right to exercise any First Amendment freedom now or in the future, nor is it a self-executing violation of the Constitution similar to a violation of the Establishment Clause. [11]

Given that authority, the Court must look to the nature of plaintiffs' claims, and it cannot find that the particular alleged constitutional violations, within the specific context of the facts of this case, present the loss of a constitutional right that is inherently irreparable.

Plaintiffs maintain that the Clean Hands Law denies them both procedural and substantive due process, and that it denies them equal protection of the laws since it punishes them for their indigency and creates a classification system based on ability to pay.  Compl. ¶¶ 109–125.  As for whether due process rights have been threatened or impaired here, the Court notes that the Clean Hands Law contemplates that several forms of process will be available to applicants for city licenses; it provides that a license or permit will not be denied if the applicant has a pending timely appeal of the debt, or if the applicant has already agreed to a payment schedule that will eliminate the outstanding debt.  *See* D.C. Code §§ 47-2862(b)–(c).  Moreover, immediately after a license or permit is denied, the applicant may request a hearing within ten days of that decision. § 47-2865(c).

---

11      Plaintiffs do not even attempt to explain how the alleged Eighth Amendment violation causes irreparable harm beyond their general proclamation that the "violation of constitutional rights is a well-established irreparable harm," Mot. at 3, which, as the Court discussed in this section, does not accurately summarize the law in this circuit.  While the Court does not need to decide at this stage whether the unpaid fines at issue even implicate the Eighth Amendment, it finds for purposes of the present motion that plaintiffs' Eighth Amendment claim alleges economic injuries that do not constitute irreparable harm for the reasons set forth in Section II.

Plaintiffs do not fall into either of the first two categories, and they maintain that since neither step is likely to afford relief, *see, e.g.*, Declaration of Stephanie Carrington, Ex. B to Mot. [Dkt # 3-3] ¶ 13 (stating that a D.C. government employee told her that if she paid $3,000 up front, she could get on a payment plan), neither supplies the constitutionally mandated process that must be afforded when a governmental benefit is denied.[12]  But plaintiffs have not applied for new licenses and been turned down either, so none have availed themselves of the right to appeal.[13]  As plaintiffs explained for the first time at the hearing, the theory underlying their due process claim is that the availability of post-deprivation review of a denied application is not sufficient to satisfy the constitution; in their view, the statute is unconstitutional because it operates automatically and includes no *pre*-deprivation review of outstanding debts before the licensing authority.  *See* Tr., Aug. 14, 2023 Hearing [Dkt. # 26] at 13.  This is a problematical legal foundation for the far-reaching relief sought when the statute by its own terms does not apply if there is a pending appeal with the agency to which the debt is owed.

Moreover, the difficulties plaintiffs describe involving their inability to support themselves and their families, or to pursue their preferred profession, appear to flow from the lack of a license as opposed to the lack of process in the application process.  Since plaintiffs have not even sought the licenses, these injuries are far too speculative to support an injunction.  Given the availability of an appeal after a license has been denied, one would be hard-pressed to conclude that any certain

---

12    Defendants maintain in their combined opposition and motion to dismiss that no process is due because plaintiffs lack a property interest in the licenses at issue, *see* Opp. at 19, but the Court need not reach that question to decide the motion.

13    This gives rise to serious standing questions presented in the pending motion to dismiss, *see* Opp. at 11–17, but these need not be resolved to rule on the motion for emergency relief.

irreparable harm flows from the continued implementation of the statute while it undergoes review.[14]  Moreover, to the extent one can identify any injury to the plaintiffs that flows from the structure of the statute as is, plaintiffs have not explained why that injury would not be reparable if the Court ruled in their favor and ordered the District to supply more process earlier.[15]

## II. The passage and funding of the Street Vendor Advancement Amendment Act of 2023 means that the street vendor plaintiffs no longer face irreparable harm.

Most importantly, though, the situation has changed markedly for the street vendor plaintiffs since this lawsuit was filed.  The door is no longer shut in plaintiffs' faces as counsel argued at the time of the hearing: the Street Vendor Advancement Amendment Act of 2023 has been funded as of October 1, 2023,  *see* Defs.' Oct. 3 Response, and the Amnesty Program is "fully operational and accepting applications."  *Id.*, citing D.C. Dep't of Licensing & Consumer Prot. ("DLCP"), *Street Vending Amnesty Program*, https://dlcp.dc.gov/node/1683076 (last visited Nov.

---

14     Plaintiffs insist that they have established irreparable harm because "without injunctive relief, the District's conduct is certain to occur in the future, in violation of Plaintiffs' constitutional rights."  Reply at 40.  This contention falls away with the implementation of the Street Vendor Advancement Amendment Act, and it suffers from the same flaws as the arguments discussed above; it assumes that plaintiffs' constitutional rights have been violated already, and it assumes that plaintiffs, who haven't applied for licenses yet, will not receive the necessary process if and when they do so in the future.

15     The Court is also troubled by plaintiffs' inability to identify the point at which they were injured: when the statute was passed in 1996?  When plaintiffs first incurred the debts that rendered them ineligible for licensure?  When their licenses expired and it was time to apply for renewal, but they did not do so because they would not have been able to obtain the necessary Clean Hands Law certificate?  And if that was the situation they faced when trying to renew their licenses in 2021, for example, *see* Ayele Decl. ¶ 7; Ghebrehrhan Decl. ¶ 8; how can one square the fact that they waited until June of 2023 to file this action with the claim that they have been suffering great and irreparable harm all along?

30, 2023) ("DLCP Amnesty Program Website").[16]  The stated purpose of the program is to allow street vendors with certain debt to qualify to obtain a Vending License, and those who qualify will be eligible to have their unpaid debt forgiven.  *See* DLCP Amnesty Program Website.  The debt must have been incurred between January 1, 2010 and September 30, 2023 for either (i) DLCP vending violation fines, and/or (ii) minimum sales tax payments issued by the Office of Tax and Revenue (OTR) under D.C. Official Code § 47-2002.01.  *Id.*  Notably, a street vendor applying to the Amnesty Program does not need to submit a Clean Hands certification.  *See id.*  Since even the "possibility" that "corrective relief will be available at a later date . . . weighs heavily against a claim of irreparable harm," *Wisc. Gas Co.*, 758 F.2d 669 at 674, plaintiffs certainly cannot make the showing when corrective relief is actually available now.

Plaintiffs maintain, though, that nothing has changed.  On November 9, 2023, plaintiffs filed a response to the District's submission, asserting that the "program's implementation issues" are preventing the five street vendor plaintiffs from securing any relief, and that therefore, they continue to face irreparable harm.  *See* Pls.' Response to Defs.' Oct. 3 Response [Dkt. # 31] ("Pls.' Response") at 2.  Plaintiffs maintain that the DLCP online business portal containing the amnesty program application has not been modified to reflect two key changes codified in the Act. *Id.* at 2.  First, they assert that submitting a basic business license application requires uploading a Clean Hands certificate, which they cannot obtain.  *Id.*  But, defendants respond that this is not the case, and they have submitted screenshots of the application website that demonstrate how it

---

16      To apply for the Amnesty Program, an applicant must submit the following documents to DLCP:  a basic business license application; a vending site permit; a copy of each unpaid citation received and the amount owed; and documentation from the Office of Tax Revenue "verifying the amount of delinquent minimum sales tax, interest, and penalties owed."  *See* Amnesty Program Website.

works. *See* Defs.' Response to Pls.' Response [Dkt. # 32] at 1–2 ("Defs.' Nov. Response").  As their submission reveals, the application first includes the step, "Check Amnesty Program Availability," followed by a separate step, "Certificate of Clean Hands."  *Id.*, citing Ex. A to Pls.' Response [Dkt. # 32-1] ("Application Screenshots").  If an applicant is found to be eligible for the amnesty program, the next screenshot indicates that "a Certificate of Clean Hands is not required for [a] business license application," and the individual may proceed to the next step.  Application Screenshots at 10.

Plaintiffs also complain that the District is requiring individuals to satisfy requirements that are not in the statute, such as creating a legal entity and providing a trade name and registered agent.  Pls.' Response at 3.  However, defendants again dispel plaintiffs' contentions with screenshots of the application process.  When asked if they want to create and register a legal entity, applicants can select "none of the above" rather than selecting a type of entity.  *See* Application Screenshots at 1.  Applicants can similarly select "no" when asked if they are planning to use a trade name, *id.* at 5, and they are only asked for registered agent information if they are "a sole proprietor and live outside the district," Ex. A to Pls.' Response.  While plaintiffs contend that their problems have been aggravated by the fact that key portal documents are only available in English, Pls.' Response at 3, defendants respond that DLCP has a dedicated helpline to assist applicants with specific questions and provide services in other languages, and that they are also working to create non-English application portals.  Defs.' Nov. Response at 2.

Plaintiffs further argue that they are facing irreparable harm because the District has "begun taking steps to collect debt the Vendor Plaintiffs have been unable to pay in part due to their inability to obtain street vendor licenses under the Clean Hands Law," such as sending an eviction warning notice and placing levies on their bank accounts.  Pls.' Response at 3.  But the fact that

the agencies to which they owe taxes are trying to collect them is irrelevant and would not be cured by enjoining the Clean Hands Law.  If plaintiffs submit their applications to the Amnesty Program, any unpaid debts owed due to street vending fees can be abated.  *See* D.C. Code § 47-2002.01(e)(1) ("[T]he Chief Financial Officer shall abate any unpaid portion of the assessment of the minimum tax (or a liability in respect of a minimum tax). . . as eligible for abatement pursuant to [the Amnesty Program].").  In sum, plaintiffs have failed to show that the Amnesty Program is not a form of corrective relief that undermines the street vendor plaintiffs' claim of irreparable harm.

### III.     The remaining plaintiffs' economic injuries do not qualify as irreparable harms.

Plaintiffs' second theory of irreparable harm is that the Clean Hands Law is "irreparably harming [p]laintiffs by trapping them in poverty and severe economic distress, preventing them from supporting themselves and their families, and blocking them from working in their desired profession."  Reply at 40; Mot. at 40.  This is not what the facts show as to the plaintiffs who cannot avail themselves of the Street Vendor Advancement Amendment Act; while plaintiff Carrington is unable to obtain a license to work as a speech pathologist in the District, she is fully licensed in two states and has not been rendered destitute by the rigid nature of the statute.  *See* Compl. ¶ 9.  And plaintiff Cheatham may not yet be able to launch his dreamed-of plumbing business, *see* Compl. ¶ 8, but he is not prohibited from obtaining employment in that or other fields.  Plaintiffs cite *Bryan v. Hall Chem. Co.*, 993 F.2d 831, 836 (11th Cir. 1993) as support for the argument that they would suffer irreparable harm if prevented from working in their chosen professions, *see* Mot. at 40, but that case involved a non-compete agreement that would have made the plaintiff "virtually unemployable" in the industry in which he had spent most of his life, and there are no comparable circumstances here.

The requirement that each plaintiff must pay off the liability that has accrued for past traffic violations and parking tickets does not meet the standard for harm that is certain and great or irreparable.  Circuit precedent is clear that "[w]here the injuries alleged are purely financial or economic, the barrier to proving irreparable injury is higher still, for it is 'well settled that economic loss does not, in and of itself, constitute irreparable harm.'"  *Mexichem Specialty Resins, Inc. v. E.P.A.*, 787 F.3d 544, 555 (D.C. Cir. 2015), citing *Wisc. Gas Co.*, 758 F.2d 669 at 674; *see also Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1296 (D.C. Cir. 2009) (explaining that "[t]he Supreme Court has echoed this message, finding that 'the temporary loss of income, ultimately to be recovered, does not usually constitute irreparable injury'"), citing *Sampson v. Murray*, 415 U.S. 61, 90 (1974).[17]

As for the street vendors, the alleged financial injury can no longer support an injunction since relief is available through the Street Vending Amnesty Program.  *See Mexichem*, 787 F.3d at 555 ("Financial injury is only irreparable where no adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation.") (internal citations and quotation marks omitted); *see also Sampson*, 415 U.S. at 90 (finding that "temporary loss of income" generally cannot constitute irreparable injury).

---

17      Plaintiffs cite two out of circuit decisions to support their argument that they are facing irreparable harm.  Mot. at 40.  Not only are these decisions not binding on this Court, but they are inapposite.  In *Justiniano v. Soc. Sec. Admin.*, 876 F.3d 14, 28 (1st Cir. 2017), the court examined the irreparable harm showing in the context of a judicial waiver of exhaustion, not a preliminary injunction.  And in *Sultana v. MD Safayet Hossain*, 575 F. Supp. 3d 696, 699 (N.D. Tex. 2021), the court found that "living under 125% of the poverty line constitute[d] irreparable harm. . . *for purposes of this motion*," which was a motion for preliminary injunction specifically seeking the spousal support that plaintiff depended on to survive.

**CONCLUSION**

Because plaintiffs have failed to show that their alleged constitutional and economic injuries establish irreparable harm, the Court need not consider the three remaining factors that bear on a request for interim injunctive relief.  *See England*, 454 F.3d at 297.  Accordingly, plaintiffs' motion for a preliminary injunction [Dkt. # 3] is **DENIED**.

**SO ORDERED.**

AMY BERMAN JACKSON
United States District Judge

DATE:  December 1, 2023